UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DENNIS KELLY, LYNNETTE KELLY, | § | |
| KERI KELLY, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. H-03-1 |
| | § | |
| FERROSTAAL, INC, | § | |
| | § | |
| Defendant. | § | |

ORDER

Beginning on November 2, 2004 and ending on November 3, 2004, the Court conducted a bench trial in the above-entitled matter at which the parties presented oral argument, evidence, and thereafter submitted briefs. Having considered the argument, testimony, submissions on file, and applicable law, the Court enters the following opinion and order pursuant to Federal Rule of Civil Procedure 52(a). Any finding of fact that should be construed as a conclusion of law is hereby adopted as such. Any conclusion of law that should be construed as a finding of fact is hereby adopted as such.

INTRODUCTION

This is a discrimination and retaliation suit brought under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq*., by Dennis Kelly and Lynnette Kelly (collectively, "Plaintiffs") against Ferrostaal, Inc.

("Ferrostaal").  Specifically, the Plaintiffs claim they were discriminated against and Dennis Kelly was ultimately terminated on July 1, 2002 in violation of section 510 of ERISA, 29 U.S.C. § 1140.  At the outset, the Court notes it previously denied summary judgment to Ferrostaal in the instant case on July 7, 2004.  The Court's function at the summary judgment stage is governed by Rule 56, which dictates that the Court is not to weigh the evidence and determine truth, but to determine whether there is a genuine issue for trial.  Fed. R. Civ. P. 56.  Because ERISA calls for a bench trial, the Court's function during a bench trial is to take on the role reserved for a jury by weighing the credibility of the witnesses and making factual findings. *See, e.g., LeTourneau Lifelike Orthotics & Prosthetics, Inc. v. Wal-Mart Stores, Inc.*, 298 F.3d 348, 350-51 (5th Cir. 2002) (stating general rule regarding the district court's factual findings during a bench trial); *Estate of Bratton v. Nat'l Union Fire Ins. Co.*, 215 F.3d 516, 520 (5th Cir. 2000) (indicating district court premised its legal conclusions on its findings of fact during bench trial).

<u>FINDINGS OF FACT</u>

1.  Ferrostaal, a subsidiary of MAN Capital Corporation, is a Houston-based company that is primarily involved in the buying and selling of various types of steel and other products on the global market.

2.  Prior to July 2002, Ferrostaal employed approximately 100 employees in the United States, with approximately 50 to 60 employees in its Houston office.

3.  Ferrostaal is a participating sponsor of the MAN Group of Companies USA Group Insurance Plan (the "Plan"), an ERISA-governed employee welfare benefit plan.

    a.  Prior to January 1, 2001, the Plan was self-insured and funded through a VEBA Trust, with the benefits being administered by Great West Life & Annuity Insurance Company.

    b.  After January 1, 2001, the Plan benefits were funded through an insurance policy issued by Aetna.  The premiums are paid into the trust by multiple participating companies.  Each participating employer, including Ferrostaal, pays a monthly premium based on the number of participants employed by the respective employer.

    c.  Under both Aetna and Great West, the Plan included a stop loss policy, which limited the claims payable by the Plan on behalf of any single

participant to $100,000 and $150,000 per year, respectively.

    d.    The Plan provides medical, dental and vision benefits to eligible employees and their dependants.

    e.    On average, approximately 500 employees, plus their dependants, are covered under the Plan.

4.    Ferrostaal hired Dennis Kelly as a cost accountant in September 1988.

    a.    Tony Ping and Leon Neu hired Dennis Kelly.

5.    Plaintiffs were participants in Ferrostaal's health insurance plan. Dennis Kelly also participated in Ferrostaal's 401(k) plan.

    a.    Dennis Kelly's wife, Lynnette, and daughter, Keri, suffered from various health concerns, which generated medical costs to the Kelly family. For example, Lynnette had been treated for diabetes, autoimmune disorder, lupus, migraine headaches, and bipolar disorder. Keri was diagnosed with bipolar disorder and juvenile diabetes.

    b.    Dennis Kelly testified he was extremely reliant on Ferrostaal's insurance plan because of his family's health issues.

6.    Ellen Mullarz, a broker with Frenkel Benefits, LLC, testified that the MAN Group is one of her clients. The MAN Group is comprised of eleven

employers, including Ferrostaal.   The benefits are financed by an Aetna contract, which is an insured contract policy.   Aetna develops the premium based on past experience and sets a rate for the cost of the plan.   Each employer's costs are calculated based on the experience of the group as a whole with an inflation factor, taking an average for the covered persons and setting the premium.   The premium for each employer is based on the number of employees and the type of coverage selected.   Ferrostaal is not obligated to pay any claims that exceed the premiums.   The claims experience for one year is used to help calculate the premium for the following year, up to a specific threshold.

     a.    Ellen Mullarz testified that Ferrostaal's premium increases during 2000 to 2002 were within the national average.

7.    While employed at Ferrostaal, Dennis Kelly paid monthly health insurance premiums.

8.    Dennis Kelly was one of five cost accountants employed by Ferrostaal.

9.    Each cost accountant was responsible for handling several numbered branches, which represented business units, selling various types of steel products.

10.    Dennis Kelly was responsible for handling five branches: 1134, 1145, 1155, 1182 and 1183.

11.    Dennis Kelly testified that each branch's accounting activities were different due to the differing products handled by each branch and the layout of each branch's purchase orders and/or invoices.

12.    Dennis Kelly performed many of his accounting tasks outside of the company's automated system and chose to do the functions manually.

    a.    Dennis Kelly testified that he would export information from Ferrostaal's mainframe and analyze his accounts.

    b.    Dennis Kelly testified that some branches required outside analysis because the mainframe system would not provide the appropriate data.

    c.    Walter Lum, Kelly's former supervisor, testified that he observed Dennis Kelly doing his reconciliations manually instead of using the new computer system.

13.    Dennis Kelly testified that he spent time on personal issues while at work.

14.    During his tenure with Ferrostaal, Dennis Kelly worked as much as seventy (70) hours per week.  It was common for Dennis Kelly to work overtime and/or work on weekends.  At the time of his termination, Dennis Kelly was

working more than forty (40), but less than fifty-five (55), hours per week.

15.    On occasion, Dennis Kelly worked from home by accessing Ferrostaal's computer system.

16.    In 2002, Dennis Kelly was the most senior cost accountant at Ferrostaal.

17.    Cost accountants report to the Controller, who allocates the work to the accountants.

    a.    Work assignments and reassignments in Ferrostaal's accounting department were made by the Controller.

    b.    Dennis Kelly testified that the Controller was in charge of delegating the work and could create a lack of work or increase in work for a particular accountant.

    c.    Dennis Kelly testified that the volume of work at Ferrostaal fluctuated.

18.    The Controller reports to the Vice President of Finance.

19.    Matthias Lietsch ("Lietsch"), current Vice President of Finance, was Dennis Kelly's supervisor from 1997 to 1999 while Lietsch was Controller.

20.   In September 1999, Oliver Rathmann ("Rathmann") assumed the Controller position.

21.   Lietsch and Rathmann were close and spoke German to one another in the office.

22.   Rathmann began to experience problems with Dennis Kelly shortly after becoming his supervisor.

   a.   Rathmann testified that Dennis Kelly's manual performance of accounting tasks artificially increased Dennis Kelly's workload.

   b.   Rathmann testified that he told Dennis Kelly on several occasions that the manual entry of work was unnecessary.

   c.   Rathmann testified that Dennis Kelly resisted efforts to assign him new work or special projects, by either refusing to do the work or by making things so difficult that the work would have to be reassigned to someone else.  Rathmann stated Dennis Kelly would give him the cold shoulder or refer to his family's medical situation as reason for not taking on work.

   d.   In contrast, Dennis Kelly testified he was never told that he worked inefficiently, he was never told he was reluctant or rigid to change, his

supervisors never told him he had an attitude problem, and he was never disciplined for insubordination.

23. Dennis Kelly always received positive performance evaluations during his employment with Ferrostaal.

    a. Dennis Kelly received one written performance review by Lietsch on August 31, 1998. His other performance reviews were oral.

    b. Dennis Kelly's last evaluation was in January 2002 and was conducted by Rathmann.

24. During his tenure with Ferrostaal, Dennis Kelly received annual raises and bonuses. Over his fourteen years with the company, his salary approximately doubled.

    a. After his January 2002 performance evaluation, Dennis Kelly received a raise and bonus.

    b. However, Rathmann testified that Dennis Kelly's bonuses were lower in comparison to his co-workers in the accounting group.

25. The Kelly family began to experience significant medical claims in 1999. In connection with the treatment of Lynnette and Keri, there were also a number of claims between 2000 and 2002.

a.  A BEN Report, titled "Individual Claims Listing," was provided to Ferrostaal, which outlined the Kelly family's medical claims.  The BEN Report indicates, from January 1, 2000 to December 31, 2000, the Kelly family's expenses were $246,182.54 as the amount charged and $186,282.52 as the amount paid.  The BEN Report also indicates, from January 1, 2001 to December 31, 2001, the Kelly family's expenses were $147,027.15 as the amount charged and $120,619.77 as the amount paid.

b.  Another BEN Report, titled "Large Claims Listing," was run on December 4, 2001 and covered January 1, 2000 to December 31, 2000.   The report appears redacted, but lists only the claims of Lynnette Kelly totaling $245,405.71 for the year 2000.

c.  It is unclear who requested or reviewed these BEN Reports.

26.  Dennis Kelly testified that Lietsch and Rathmann were aware of his family's health problems.

a.  Dennis Kelly testified that he and Lietsch traveled to New York regarding the 1155 branch and, during that trip, they discussed personal information regarding Keri Kelly.

b.   Dennis Kelly testified that he had a discussion regarding trying to lower his co-pays with Lietsch in Lietsch's office.

  i.   During that conversation, Dennis Kelly alleges Lietsch suggested that Lynnette Kelly's condition was not real and called Lynnette a hypochondriac.

  ii.   However, there was testimony that Dennis Kelly may have authored the statement regarding Lynnette being a hypochondriac.

  iii.   There was also testimony that Lynnette's family and physicians had suggested she may be chemically addicted.

c.   At some point during a mutual conversation with Dennis Kelly, Lietsch suggested that Dennis Kelly should look into social security or taking a hardship withdrawal.

d.   Lietsch was blind copied on e-mails between human resources and Dennis Kelly, which dealt with insurance issues.

e.   Although Lietsch testified that he did not know how the premiums were calculated, Lietsch generally understood that claims impacted Ferrostaal's insurance premiums.

f.    On June 1, 2002, Dennis Kelly e-mailed Lietsch regarding a 401(k) hardship withdrawal.  The e-mail outlines Dennis Kelly's financial situation as well as Lynnette' medical expenses and co-pays.

g.    Dennis Kelly testified that Rathmann was aware of his cash flow and that 20% of Dennis Kelly's salary went to cover medical co-pays.

h.    Rathmann testified that he knew Dennis Kelly's wife and daughter were sick because Dennis Kelly would volunteer the information.

i.    Rathmann was aware that Dennis Kelly took his wife to the doctor often.

j.    In conversations with Dennis Kelly, Rathmann told Kelly he was a "good man" to support Lynnette because Rathmann could not do it.

k.    Rathmann was aware that Dennis Kelly was interested in a hardship withdrawal.

27.    Dennis Kelly testified that it was well-known within the company that his family had medical problems.  He also testified that his co-workers were aware of his family's problems due to his absences from work.

a.    Janet Clark and Walter Lum testified that it was common knowledge at Ferrostaal that Dennis Kelly's family had significant medical issues.

b.     More than one employee at Ferrostaal suggested that Dennis Kelly should divorce his wife due to her condition.

c.     Dennis Kelly testified that a branch manager, Axel Barron, commented that Dennis Kelly's medical expenses were the reason insurance costs at Ferrostaal were so high.

28.   Dennis Kelly testified he regularly corresponded with human resources about insurance, benefits, and 401(k) issues.

a.     Janet Clark in Ferrostaal's human resources department helped Dennis Kelly with benefit issues.

     i.     Janet Clark was employed by Ferrostaal from 1994 to early 2001.

b.     After Janet Clark left, Lydia Snider assisted Dennis Kelly.

     i.     Lydia Snider handled benefit issues from 2001 to 2003.

c.     Rebecca Witt was also a part of Ferrostaal's human resources department.

     i.     Rebecca Witt handled benefit issues from November 2003 until September 2004.

d.     Dennis Kelly testified that human resources was copying Lietsch on his

e-mails.  Janet Clark blind copied Lietsch on several e-mails to Dennis Kelly responding to concerns regarding changing policies, co-pay amounts, and clarifying doctor and network coverage.

    i.    Janet Clark testified that she considered Dennis Kelly a high maintenance employee because he had significant medical problems in his family, had a lot of insurance concerns, and was vocal in expressing his dissatisfaction with insurance problems. Janet Clark also pursued the settlement of disputes regarding the payment of Dennis Kelly's insurance claims.

    ii.    Janet Clark testified that she was instructed to copy Lietsch on all communications with employees.

29.    Ferrostaal's human resources department reported to Lietsch, the Vice President of Finance and Administration, regarding insurance costs and financial issues, but reported to Ferrostaal's President for other issues.

30.    In December 2000, prior to the time Ferrostaal was switching from Great West to Aetna, Dennis Kelly made several inquiries with Janet Clark regarding doctors who would be covered under the new Aetna-administered Plan.

31.   On another occasion, in response to Dennis Kelly's inquiries regarding affordable healthcare for his children, Rebecca Witt suggested that Dennis Kelly take his children off the Ferrostaal Plan and put them on the Texas CHIPS program because it is based on income and may save Dennis Kelly some money.

   a.   Rebecca Witt volunteered this option to Dennis Kelly.

32.   Dennis Kelly testified that he did not consider the comments made to him by Rebecca Witt, Lietsch, and Rathmann regarding his wife's condition and/or his family's financial condition as harassment at the time the statements were made.

33.   On June 1, 2002, Dennis Kelly inquired about the steps necessary to take a hardship withdrawal from Ferrostaal's 401(k) Plan.   Dennis Kelly did not submit a request for a hardship withdrawal.   In fact, Dennis Kelly testified that he abandoned the request because the stock market had dropped and he did not want to take a loss.

   a.   In contrast, Dennis Kelly testified that he did not make the hardship withdrawal because he met with resistance from Lydia Snider.

   b.   Dennis Kelly also testified that he was fearful of turning over the

medical information to allow Ferrostaal to determine eligibility.

c.      In addition, the market had declined such that his 401(k) balance had decreased.

34.   On June 6, 2002, Dennis Kelly alleged he confided in John Foster, one of Ferrostaal's Vice Presidents, regarding the request for a hardship withdrawal. Dennis Kelly stated he was concerned regarding termination.  John Foster responded via e-mail, telling  Dennis Kelly he did not believe Ferrostaal would terminate him based on medical expenses.

a.      A July 8, 2002 e-mail from Dennis Kelly to John Foster indicates that Dennis Kelly forgot and possibly did not inform John Foster about the hardship request on June 6, 2002 as alleged.

b.      In the July 8, 2002 response from John Foster, he agrees that Dennis Kelly got "screwed" by Ferrostaal, but testified at trial that he was merely being supportive of Dennis Kelly.

c.      John Foster had no supervision of Dennis Kelly or the accounting department.

d.      John Foster was not involved in Dennis Kelly's termination.

35.   Beginning in January 2001, the United States economy began to slow down,

resulting in a decreased demand for raw materials, including steels.

36.   Ferrostaal alleged it suffered a decline in business starting in 2001 as a result of this general downturn in the economy and the Bush Administration's announcement in August of 2001 that it was implementing a 30% tariff on steel imports in March of 2002.

    a.   Lietsch testified that Ferrostaal lost 20 to 30% of its business in the U.S. marketplace due to the tariff legislation and downturn of the steel industry.

37.   Dennis Kelly's workload diminished significantly in 2001 and 2002.

38.   During 2001 and 2002, one of Dennis Kelly's branches no longer required accounting work due to a bankruptcy filing.  Another branch, which was previously labor intensive, had significantly less activity because various problem areas within the branch had been corrected.

39.   Dennis Kelly testified that he discussed the impact of the tariff legislation with the 1155 branch manager.

40.   In August 2001, Rathmann assigned the FML Canadian accounts to Dennis Kelly.

41.   The FML Canadian accounts were previously assigned to Carol Douglas, but

Rathmann needed to reassign the account because Carol Douglas was working on an additional SAP project.

42. Dennis Kelly testified that he had not worked on a Canadian account in several years.

43. Dennis Kelly had trouble performing the FML Canadian account work because he was unfamiliar with it. He testified that the FML Canadian accounts had unique requirements that he had not done before, like the cash report, which had previously been handled by the Controller.

44. Dennis Kelly expressed frustration with receipt of the FML Canadian accounts because he was unable to balance this new project with his personal issues.

45. Dennis Kelly felt he could not complete the FML Canadian account work without working weekends.

46. Dennis Kelly discussed the problem with Carol Douglas, an accounting department co-worker, who agreed to help him.

47. In an e-mail to Rathmann on August 22, 2001, Dennis Kelly outlined his reasons for not wanting to work on the FML Canadian accounts and would prefer additional FSI accounts.  Ultimately, Dennis Kelly stated "[s]omething

else will have to be figured out."

48. Rathmann responded on August 23, 2001, stating his reasons for assigning the FML Canadian accounts to Dennis Kelly were based on seniority, his expertise in particular accounting practices, and the complexity of the FML Canadian account issues.

49. On September 14, 2001, Dennis Kelly sent an e-mail to Rathmann venting his frustration regarding the receipt of the FML Canadian accounts.  In his e-mail, Dennis Kelly stated he did "not appreciate being dumped on this way."

50. Ultimately, Dennis Kelly only worked on the FML Canadian accounts for approximately two months, and then Carol Douglas resumed work on the accounts.

51. In September 2001, Dennis Kelly approached Rathmann requesting additional work.

52. In late 2001, Dennis Kelly was informed by Ferrostaal that he could no longer work weekends.

    a. Ferrostaal paid a meal allowance and mileage when employees worked on the weekend.

    b. Ferrostaal instituted a requirement that all overtime work must be

approved.

    c.    At the time of his termination, Dennis Kelly was still working some weekends. Rathmann permitted this activity.

53. In late 2001/early 2002, Dennis Kelly was assigned the 1182 and 1183 branches.

    a.    Dennis Kelly described these branches as simple and without a lot of activity.

    b.    Dennis Kelly testified that he asked for larger activity branches, specifically asking for a branch run by Grady Foster.

54. During Dennis Kelly's January 2002 performance evaluation, Rathmann and Dennis Kelly discussed slow business and the tariff legislation's effect on steel imports.

    a.    Dennis Kelly testified that Rathmann assured him there would be work available.

    b.    Dennis Kelly also testified on cross-examination that he told Rathmann he could perform additional work.

    c.    Dennis Kelly also stated on cross-examination that he and Rathmann discussed Rathmann's desire for Dennis Kelly to take the FML

Canadian branches because Rathmann did not think Dennis Kelly had enough work to do.

d.  Dennis Kelly testified that he had a good working relationship with Rathmann, and Rathmann was supportive of Dennis Kelly.

55.  Sometime during the first quarter of 2002, Rathmann determined he would have to terminate one of the cost accountants due to a lack of work within the department.

56.  Rathmann made the decision to terminate Dennis Kelly.  Rathmann conferred with Lietsch, who subsequently approved the decision.

a.  Lietsch testified that Rathmann made the decision to terminate Dennis Kelly, and he agreed with the reasoning.

57.  Rathmann selected Dennis Kelly for termination because he had the least amount of work relative to the other cost accountants.  Rathmann also selected Kelly for termination because he was reluctant to take on new assignments.

a.  At the time of his termination, Dennis Kelly's branch assignments were slow.  Specifically, 1134 had little activity because of a bankruptcy. The majority of the 1155 branch's problems had been resolved.  The 1145 account's work had dropped off.  The 1182 and 1183 accounts

were not busy accounts.

    i.    Dennis Kelly had maintained the 1134, 1145, and 1155 branches prior to Lietsch and Rathmann's tenure as Controller.

  b.    Lietsch testified that Dennis Kelly's branches were the hardest hit, resulting in little work for Dennis Kelly.

58.  Neither Lietsch nor Rathmann considered Plaintiffs' medical expenses in deciding whether to terminate Dennis Kelly.

  a.    Rathmann testified that he had never seen the BEN reports, was not involved in the Plan administration, and was not aware of how Ferrostaal's Plan premiums were calculated.

  b.    Rathmann testified that he did not consider Plaintiffs' medical expenses in terminating Dennis Kelly.

  c.    Lietsch testified that he did not consider Dennis Kelly's medical claims or the Ferrostaal Plan in making the decision to terminate.

59.  In July 2002, Dennis Kelly was the only Ferrostaal cost accountant considered for termination.

60.  As a result of the steel industry decline, Ferrostaal terminated approximately 25 employees between January 2001 and January 2004, which represented

about 25% of its total workforce.

61.   In addition to Dennis Kelly, one other person, Shelly Randall, from the accounting department was terminated because of lack of work.

62.   Approximately 25 employees were terminated by Ferrostaal within approximately one year of Plaintiff's termination, including three people from the Administrative department, which includes the Accounting department.

    a.   As of July 2003, only four individuals were terminated from Ferrostaal due to lack of business (Dennis Kelly, Shelly Randall, Deborah Kendrick, and Maria Carmen Torres).  All four of these individuals were from the administrative section, which includes accounting.

    b.   The Court notes that John Foster testified that he was never told Dennis Kelly was part of a company layoff, and John Foster characterized business at Ferrostaal from 2000 to 2002 as "standard."

    c.   No one was laid off from John Foster's divisions in July 2002.

    d.   Rebecca Witt testified that she conducted exit interviews with these individuals.

63.   Dennis Kelly's employment with Ferrostaal was terminated on July 1, 2002.

    a.   Rathmann was Dennis Kelly's supervisor at the time.

64.     On July 1, 2002, Dennis Kelly was given a notice of termination and letter of
separation agreement to sign, but he did not sign it.

65.     Dennis Kelly testified that he was not given any warning about his termination.

66.     Dennis Kelly testified he was never told he was being underutilized.

67.     Dennis Kelly testified that Lietsch and Rathmann never discussed reallocation
of his workload or the status of his workload.

68.     Dennis Kelly asserts he was not told his layoff was part of a
reduction-in-force.

a.      In July 2002, Dennis Kelly was the only employee laid off at
Ferrostaal.

69.     At the time of his termination, Dennis Kelly's base salary was approximately
$53,700 per year.

70.     Upon Dennis Kelly's termination, Ferrostaal provided him with a severance
package equivalent to six months salary.  In addition to severance, Ferrostaal
paid $1,749.83 for accrued vacation.

71.     Dennis Kelly received unemployment compensation in the amount of $319
per week for 39 weeks for a total of $12,441.

72.     Following his termination, Dennis Kelly's work assignments were reallocated

among the four remaining cost accountants.  Ferrostaal has not hired another

cost accountant to replace Dennis Kelly.

## 1 CONCLUSIONS OF LAW

## 2 Jurisdiction and Venue

73.   This Court has subject matter jurisdiction pursuant to ERISA and federal question jurisdiction.   29 U.S.C. § 1132(a) (2000); 28 U.S.C. § 1331 (2000).

74.   This Court has personal jurisdiction over the parties.   *See, e.g., Lewis v. Fresne*, 252 F.3d 352, 358-59 (5th Cir. 2001).

75.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

1 <u>Employee Retirement Income Security Act</u>

76.   An employee welfare benefit plan is defined as:

> 2any plan, fund or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care

centers, scholarship funds, or prepaid legal services, or

(B) any benefit described in section 186(c) of this title

(other than pensions on retirement or death, and insurance

to provide such pensions).

329 U.S.C. § 1002(1) (2000).

    a.    The Court determines the Ferrostaal Plan is a welfare benefit plan as

        defined in 29 U.S.C. § 1002(1).

    b.    Moreover, the parties do not dispute that Ferrostaal's Plan is an ERISA

        plan.

77.    Section 502 of ERISA provides plan participants or beneficiaries with the

exclusive remedies for a section 510 violation. *Millsap v. McDonnell*

*Douglas Corp.*, 368 F.3d 1246, 1247 (10th Cir. 2004).

    a.    The parties do not dispute that Dennis Kelly and Lynnette Kelly were

        participants in Ferrostaal's ERISA Plan.

78.    Under section 502 of ERISA, a civil action may be brought by a participant

or beneficiary to "enjoin any act or practice which violates any provision of

this subchapter or the terms of the plan" or "to obtain other appropriate

equitable relief . . . to redress such violations or . . . to enforce any provisions

of this subchapter or the terms of the plan."  29 U.S.C. § 1132(a)(3) (2000).

    a.    Plaintiffs asserted their claims under ERISA section 502(a)(3) based on alleged violations of ERISA section 510.

79.    Section 510 of ERISA provides:

> 4It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act . . . .

529 U.S.C. § 1140 (2000).

80.    Essentially, ERISA section 510 has two components: (1) an anti-discrimination or anti-retaliation component, which prohibits an employer from discriminating or retaliating against an employee for exercising ERISA rights and (2) an anti-interference component, which prohibits interference with an employee's future right to benefits.  *Id*.; *Juarez-Keith v. U.S.*

*Foodservice, Inc.*, No. Civ. A. 3:02-CV-0090L, 2005 WL 548074, at *10 (N.D. Tex. Mar. 8, 2005).

81. Congress enacted section 510 "primarily to prevent employers from discharging or harassing their employees in order to keep them from obtaining ERISA-protected benefits." *Kowalski v. L & F Prods.*, 82 F.3d 1283, 1287 (3d Cir. 1996).

82. A plaintiff may establish a violation of section 510 using either direct or circumstantial evidence. *Holtzclaw v. DSC Communications Corp.*, 255 F.3d 254, 260 (5th Cir. 2001) (allowing inference of discrimination to be shown by circumstantial evidence); *Garratt v. Walker*, 164 F.3d 1249, 1256 (10th Cir. 1998) (indicating a plaintiff may rely upon direct or indirect evidence that an adverse employment action was motivated by his employer's intent to interfere with ERISA-protected employee benefits); *Salus v. GTE Directories Serv. Corp.*, 104 F.3d 131, 135 (7th Cir. 1997) (stating the plaintiff may show specific intent by either presenting direct evidence of interference or by utilizing the burden-shifting analysis of *McDonnell Douglas*).

a. After examining the items in context, the Court does not consider any of

the statements or documentary evidence submitted by Plaintiffs to rise to the level of direct evidence of discrimination and/or retaliation. Hence, the Court determines that Plaintiffs presented only circumstantial evidence of ERISA discrimination and/or retaliation.

83. ERISA cases based on circumstantial evidence are analyzed under the tripartite burden shifting framework of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), where the plaintiff must first establish a *prima facie* case, then the burden shifts to his employer to articulate a legitimate, non-discriminatory reason for his termination, and, if successful, the burden shifts back to the plaintiff to establish that the employer's articulated reason was merely a pretext for unlawful discrimination and/or retaliation.1 *Flood v. Shell Servs. Int'l, Inc.*, 287 F. Supp. 2d 732, 738 & n.6 (S.D. Tex. 2003).

84. At all times, the burden of persuasion remains with the plaintiff. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

6Prima Facie Case

85. "To establish a prima facie case under [ERISA] § 510, a plaintiff must prove, inter alia, that his employer terminated him with the specific intent to discriminate against him for exercising, or to interfere with, any ERISA right

to which he is entitled or may become entitled." *Hinojosa v. Jostens Inc.*, No. 04-10229, 2005 WL 834847, at *3 (5th Cir. Apr. 12, 2005) (citing *Holtzclaw*, 255 F.3d at 260-61); *Bodine v. Employers Cas. Co.*, 352 F.3d 245, 250-51 (5th Cir. 2003) (requiring "unscrupulous conduct or intentional act[s]" on the part of an employer in a section 510 action); *Matassarin v. Lynch*, 174 F.3d 549, 569 (5th Cir. 1999) (stating "[a] violation of § 510 requires specific intent to discriminate"); *Nero v. Indus. Molding Corp.*, 167 F.3d 921, 927 (5th Cir. 1999); *Stafford*, 123 F.3d at 295; *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 761 (5th Cir. 1996); *Hines v. Mass. Mut. Life Ins. Co.*, 43 F.3d 207, 209 (5th Cir. 1995); *Unida v. Levi Strauss & Co.*, 986 F.2d 970, 979-81 (5th Cir. 1993); *Van Zant*, 847 F. Supp. at 73 (indicating the "key factor" in establishing a section 510 violation is specific intent to interfere with the plaintiff's rights under an ERISA plan).

86.    In addition to specific intent, the plaintiff must show: (1) membership in a protected class (*i.e.*, was a participant or beneficiary of an ERISA plan); (2) qualification for the position occupied or sought (*i.e.*, that the plaintiff was satisfactorily performing his job and was entitled to rights under an ERISA plan); and (3) discharge or denial of employment in a manner providing a

basis for believing that specific intent to discriminate or retaliate is present. *Stafford*, 123 F.3d at 295; *Van Zant*, 847 F. Supp. at 72-73.

87.   In an ERISA employment discrimination or retaliation context, the plaintiff is not required to prove that the discriminatory or retaliatory reason was the only reason for his discharge, but he must show the loss of his benefits was more than an incidental loss from his discharge, which can be shown by circumstantial evidence. *Holtzclaw*, 255 F.3d at 260; *Stafford*, 123 F.3d at 295; *Olitsky v. Spencer Gifts, Inc.*, 964 F.2d 1471, 1478 (5th Cir. 1992); *Carlos*, 934 F. Supp. at 232.

88.   With respect to Plaintiffs' *prima facie* case, the Court determines the following: (1) Plaintiffs Dennis Kelly and Lynnette Kelly participated in an ERISA protected plan; (2) Dennis Kelly was qualified for his position as a cost accountant at Ferrostaal; and (3) Ferrostaal terminated Dennis Kelly's employment.

89.   The Court notes Dennis Kelly alleges his termination is related to his use of and reliance on Ferrostaal's Plan to cover his family's medical expenses.

90.   ERISA states it requires proof of "specific intent" to interfere with an individual's benefits, and the standard of proof is usually a showing that

ERISA benefits were "a motivating factor" in the adverse employment action. *See Nero*, 167 F.3d at 927; *Morris v. Winnebago Indus., Inc.*, 950 F. Supp. 918, 925 (N.D. Iowa 1996); *see also Matassarin*, 174 F.3d at 569 (stating "[a] violation of § 510 requires specific intent to discriminate.").

91.    In this case, the Court determines Plaintiffs' circumstantial evidence does not establish a specific intent to discriminate and deprive Dennis Kelly and/or Lynnette Kelly of benefits under the Plan.

    a.    Plaintiffs' allegations that Lietsch and Rathmann were aware of his health care related expenses or family's medical problems do not establish that Ferrostaal or its representatives were aware of any impact the Kellys' situation had on Ferrostaal's ERISA Plan.

    b.    Plaintiffs' evidence regarding statements made by Ferrostaal's management, specifically Lietsch and Rathmann, regarding health care, medical insurance costs, or Lynnette Kelly's health do not give rise to an inference of discrimination, especially when viewed in the context of the statements. *See Unida*, 986 F.2d at 980.

    c.    Dennis Kelly did not consider many of the statements made by Ferrostaal employees, including Rathmann and Lietsch, to be harassing

or offensive.

d.     Plaintiffs' use of the September 15, 2000 memo from Janet Clark to Lietsch does not give rise to an inference of discrimination or retaliation regarding insurance costs as it is a study to determine whether Ferrostaal should alter its insurance plan.

e.     To the extent Dennis Kelly complained of harassment by Ferrostaal, the Court determines Dennis Kelly volunteered much of the information regarding his family's medical situation to various Ferrostaal employees in casual conversation.

f.     Dennis Kelly's request for a hardship withdrawal is not evidence of discriminatory or retaliatory animus on the part of Ferrostaal as Dennis Kelly never formally made a request and decided not to on his own accord.

g.     While the Court notes that the large claim listing BEN report may be unusual, no link was established by Plaintiffs that Ferrostaal, specifically Lietsch or Rathmann, was aware of this report and used any information from the report in the decision to terminate Dennis Kelly.

h.    The Kelly family medical expenses were declining at the time of Dennis Kelly's termination in 2002.

92.    Therefore, the Court determines Plaintiffs did not establish the requisite specific intent for an ERISA section 510 violation.

7  Legitimate, Non-discriminatory, Non-retaliatory Reason

93.    Assuming *arguendo* that Plaintiffs could establish a *prima facie* case under section 510, to dispel any inference of ERISA discrimination or retaliation, the employer must articulate a legitimate, non-discriminatory or non-retaliatory reason for its action.   *Stafford*, 123 F.3d at 295; *see also Rogers*, 87 F.3d at 761; *Van Zant*, 847 F. Supp. at 73.

94.    Ferrostaal contends it terminated Dennis Kelly due to a lack of work and reluctance to accept additional work.

95.    The Court finds Rathmann's testimony that he chose Dennis Kelly for termination based on a lack of work credible, in light of the fact that Dennis Kelly testified that his work load had decreased in the months leading up to his termination and articulated that he was worried he may be terminated due to a lack of work.

96.    The Court also places weight on Rathmann's testimony that he selected

Dennis Kelly for termination because Dennis Kelly was reluctant to take on new assignments, as evidenced by Dennis Kelly's e-mails concerning the FML Canadian accounts.

97. While Dennis Kelly discussed his family's medical issues with Lietsch and Rathmann on separate occasions, the Court finds Lietsch and Rathmann's testimony credible that neither one was aware of the amount of Dennis Kelly's insurance claims or any impact those claims may have had on Ferrostaal's Plan.

98. The Court also notes the testimony of Rebecca Witt, from Ferrostaal's human resources, indicates that Ferrostaal laid off approximately 20 to 25 other employees following Dennis Kelly's termination.

99. Moreover, Ferrostaal has not hired another cost accountant to replace Dennis Kelly.

100. Hence, the Court determines that Ferrostaal articulated a legitimate non-discriminatory, non-retaliatory reason for terminating Dennis Kelly, namely a lack of work and reluctance to take on additional tasks.

8 Pretext

101. Once an employer establishes a legitimate, non-discriminatory or

non-retaliatory reason for its action, the presumption of wrongful intent disappears, and the burden shifts to the plaintiff to prove the employer's reason is a pretext and the real purpose of his termination was the specific intent to deny ERISA benefits. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *Stafford*, 123 F.3d at 295; *Van Zant*, 847 F. Supp. at 73.

102. The plaintiff need not prove discrimination or retaliation was the sole reason for his discharge, but must prove it had a determinative effect on his employer's decision to terminate him. *Woodson v. Scott Paper Co.*, 109 F.3d 913, 935 (3d Cir. 1997).

103. A plaintiff must establish pretext by proving more than just monetary savings for the employer. *Humphreys*, 966 F.2d at 1044; *Passarge*, 277 F. Supp. 2d at 828; *see also Carlos*, 934 F. Supp. at 232.

104. In other words, the plaintiff must show that the loss of benefits was not a "mere consequence" of his termination, but must show that it was a "motivating factor behind his termination." *See Salus*, 104 F.3d at 136.

105. At trial, Dennis Kelly and Lynnette Kelly failed to show by a preponderance of the evidence that Ferrostaal's proffered reason for Dennis Kelly's termination was pretextual or unworthy of credence and that Ferrostaal, in

fact, had the specific intent to terminate Dennis Kelly's employment for having accessed and/or received benefits under the Plan.

106. Ultimately, to prevail, the plaintiff must demonstrate that the defendant discharged him with the specific intent of interfering with his ERISA rights. *Carlos*, 934 F. Supp. at 232.

107. The circumstantial evidence put forth by Plaintiffs in support of their ERISA section 510 claim is insufficient to establish discriminatory and/or retaliatory intent on the part of Ferrostaal.

108. Thus, the Court determines Plaintiffs have not satisfied their ultimate burden of establishing that Dennis Kelly's termination was for the purpose of denying or interfering with the receipt of benefits under the Plan or in retaliation for Plaintiffs' exercising rights under the Plan.

109. Because the Court did not find for Plaintiffs, it declines to address costs and attorney's fees at this time.

9

SIGNED the 6th day of May, 2005.



David Hittner
United States District Judge